# EXHIBIT A



# CSC

## Notice of Service of Process

**DB2 / ALL**
**Transmittal Number: 21992105**
**Date Processed: 09/08/2020**

| Primary Contact: | Walker Essary<br>Sysco Corporation<br>1370 Enclave Pkwy<br>Bldg A<br>Houston, TX 77077-2025 |
|---|---|
| Electronic copy provided to: | Barrett Flynn<br>Brenda Becerra<br>Eve McFadden<br>Dawn Becker |

| | |
|---|---|
| Entity: | Sysco Boston, LLC<br>Entity ID Number 3338889 |
| Entity Served: | Sysco Boston, LLC |
| Title of Action: | J Stephen Flynn vs. Sysco Boston, LLC |
| Matter Name/ID: | J Stephen Flynn vs. Sysco Boston, LLC (10491431) |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Wrongful Termination |
| Court/Agency: | Superior Court, MA |
| Case/Reference No: | 2083CV00597 |
| Jurisdiction Served: | Massachusetts |
| Date Served on CSC: | 09/08/2020 |
| Answer or Appearance Due: | 20 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | J. Stephen Flynn<br>503-545-8681 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674  (888) 690-2882  |  sop@cscglobal.com

| Summons | CIVIL DOCKET NO.<br>2083CV00597 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME: | Robert S. Creedon, Jr. | Clerk of Courts |
|---|---|---|

CASE NAME:

Flynn, J. Stephen

Plaintiff(s)

vs.

Sysco Boston, LLC

Defendant(s)

Robert S. Creedon, Jr.   Clerk of Courts

Plymouth   County

COURT NAME & ADDRESS:

Plymouth Superior Court

72 Belmont Street

Brockton, MA 02301

THIS SUMMONS IS DIRECTED TO Sysco Boston via Resident (Defendant's name)
agent Corporation Service Company (CSC)
84 State Street, Boston MA

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the                Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Plymouth Superior Court 72 Belmont St, Brockton, MA 02301   (address), by mail or in person **AND**

b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:
J Stephen Flynn
42 Pine St, Lempster, NH 03431

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

A true copy Attest   Joseph P Casey

Deputy Sheriff Suffolk County

9-8-20

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

## 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

## 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Judith Fabricant _____ , Chief Justice on _____ , 20 ___ . (Seal)

Clerk-Magistrate _____

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated: _____      Signature: _____

**N.B.   TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

rev. 1/2019

COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS.                                         SUPERIOR COURT

| | |
|---|---|
| J Stephen Flynn, Pro se | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 2083 CV00597 |
| Sysco Boston LLC | |
| Defendant. | |

## COMPLAINT AND JURY DEMAND

### Introduction

1. By this complaint, Plaintiff J Stephen Flynn ("Flynn") seeks damages against his former employer, Sysco Boston LLC ("Defendant).

2. As more fully set forth below, Defendant stated the Plaintiff was terminated because "he did not fit in."  Plaintiff, a Massachusetts Registered Nurse, hired in part as a watchdog, had been accused "of creating OSHA recordables," (Employee injuries beyond first aid).  This was true. Plaintiff, bound by the Rules of the Massachusetts Board of Nursing, and by other statutory

obligations was required to act properly in both the care of injured employees and statutory required reporting and meticulously did so.

3. Defendant terminated Plaintiff, not in retaliation for what he had done, nor, specifically in retaliation for that which he did not do, but preemptively to make sure that transgressions of law that had been done, and those whose actors intended to do, (and who did) in the future, when necessary, to prevent hits to the metrics of the OSHA 300 Log, would not be caught by Sysco Corporation (the parent Corporation) or by OSHA. The best method to achieve the freedom to do this was to remove the "watchdog," which was effectively done by Plaintiffs' termination.

4. Defendant alleges that these actions were taken willfully, in complete disregard to the law and with callous disregard to potential serious adverse health effects to injured employees, merely to improve corporate metrics and to increase management bonuses.

5. As set below, Plaintiff alleges willful actions which include the apparently unlawful termination of one injured employee specifically to improve metrics, because he did not heal fast enough and because his English was very poor. Additional actions include a willful attempt to hide a serious injury and additional willful attempts to hide or impede the reporting of worker injuries, all in violation of Federal OSHA law. In summation these events will prove that illegal acts were, (and which continued, after Plaintiff left) routinely being perpetrated.

## PARTIES AND JURISDICTION

6. Plaintiff, J Stephen Flynn is an individual residing at 42 Pine Street, Keene, County of Cheshire, New Hampshire.

7. Defendant, Sysco Boston LLC is a Foreign Limited Liability Company (LLC), a food distribution service located at 99 Spring Street, Plymouth County, Plympton, Ma. Sysco Boston LLC is a subsidiary of Sysco Corporation whose Principal Office is located at 1390 Enclave

Parkway, Houston, Tx. The Business entity's Massachusetts office and Resident Agent is

Corporation Service Company (CSC) located at 84 State Street, Boston, MA.

8. J Stephen Flynn was employed by Sysco Boston LLC as Occupational Health Nurse

Manager (OHNM) from January, 2016 to August 17, 2017.

9. The Court has jurisdiction over the defendant pursuant to Massachusetts General Laws, Ch.

212 §4. This Court has jurisdiction over Defendant because Defendant conducts business and/or

operates in the Commonwealth of Massachusetts.

10. Venue is proper in Plymouth County pursuant to Ch. 223. §3 because Sysco Boston LLC's

principal and usual place of business is located in Plymouth County.

## FACTUAL ALLEGATIONS

11. Defendant ensures that Sysco Boston LLC is run in accordance with State law and

regulation.

12. Flynn began his employment with Sysco Boston LLC in January 2016 and was terminated

on August 17, 2017.

13. Flynn, a Massachusetts Licensed Registered Nurse was hired as Occupational Health Nurse

Manager, (OHNM) By Defendant.

14. Sysco Corporation is an American multinational corporation involved in marketing and

distributing food products and other items. In 2017 Sysco Corporation had about 66,500

employees and gross revenue of about $55 billion USD.

15. Sysco Boston LLC is a subsidiary of Sysco Corporation. It is a distribution center, referred

to within Sysco Corporation as an operating company or OPCO. Sysco Corporation has about 320

OPCOs.

3

16. Private sector entities in Massachusetts are required to comply with OSHA standards. Massachusetts requirements are as strict as OSHA, no stricter or more lenient.

17.  Sysco's Global Code of Conduct lists "Integrity:  Committed to doing the right thing," as first of its core values.  The code demands to "Ensure a Safe and Healthy Work Environment," adding, "Each of us is responsible for acting in a way that protects ourselves and others."

18. Flynn was responsible for triage and care of injured employees when he was available. Flynn was responsible for oversight and case management of all injured employees at Sysco Boston.

19. Federal OSHA law demands that injuries beyond first aid be recorded on an OSHA 300 log. This sort of injury is called an "OSHA Recordable injury." (ORI)  If Flynn determined that a worker needed to be sent to a medical Practitioner it was more than likely that the worker's injury would be classified as a "Recordable" on the OSHA log.

20.  Sysco Corporation bases OPCO performance largely upon metrics.  The most important metrics used were safety, which included OSHA 300 logged "OSHA recordable injuries" (ORI) as well as injured worker "out-of-work" days and "restricted work days".  "Out-of-work" days were also called "lost work days," (LWD).

21. Other important metrics were "cost-per-piece picked," and "cost-per-piece delivered. "Selectors" within the warehouse retrieve items, palletize them and these items are loaded upon a truck, their efficiency translates to "cost-per-piece picked."  "Delivery Associates," (Class A drivers) drive a loaded truck to a location and unload the items.  This category is "cost-per-piece delivered."

22. Adjusted "cost per case," is an important metric management used to measure expense performance.  The adjusted cost-per-case for fiscal year 2017 had increased $0.011 (1 1/10[th] cent) from fiscal year 2016.

4

23. Sysco Boston had a managerial bonus system that tied amount of bonus to metrics. Flynn had been told that the three important metrics were "cost per case picked," "cost per case delivered," and OSHA logged "recordables." Flynn's understanding was, that should Sysco Boston fail to meet targeted goals of metrics, that bonuses would be diminished or eliminated entirely.

24. Flynn was eligible for a bonus at the end of the fiscal year. Bonus attainment was based upon meeting defined targets. For fiscal year 2017 Flynn received a full bonus and was assessed at "On Target" (OT) in two of four assessment categories and "Above Target (AT) in the other two of four categories.

25. Flynn had heard that Thomas L. Bené, then the current CEO of Sysco Corporation's would eventually step down. Flynn had heard that Chuck Fraser, the Senior Vice President of Operations, who lists himself as "President, Sysco Boston" could be considered to replace Bené. Bené's annual salary was about $14 million in 2016.

26. 2017 was a year Sysco Corporation appeared to be particularly focused upon OPCO metrics. Sysco Corporation has a "Haul of Fame." The "Haul of Fame" is named as such because the food service business relies upon hauling food and supplies from warehouse to purchasing entity. The "Haul of Fame" recognizes OPCO's who have exceeded targeted goals on combined "safety, service and cost per piece." The five best OPCO's out of about 320 are recognized in the "Sysco Haul of Fame," annually. It is notable that on the Internet, there is only one video recording commemorating the annual "Hall of Fame," and that is the year 2017, the year Nurse Flynn was terminated.

27. In May, 2017, Flynn knew that the Sysco Corporate safety metric minimum goal had been exceeded and that the upper limits of allowed corporate expectations were close to being exceeded, but he did not know by how much. Flynn had asked for specific metrics and specific safety metrics

5

for the "Haul of Fame," from Wayne Belcher (Director of Safety & Regulatory), but he received no specific answer to where Boston Sysco's place was on the "Haul of Fame," relative to the safety metric, nor actual numbers on how close Boston Sysco was to exceeding the upper corporate limits on ORI.

28. Belcher had hounded Nurse Flynn to minimize hits against OSHA recordables earlier in 2017. Nurse Flynn took the request seriously, researching legal and ethical means by which this might be achieved. Nurse Flynn did find one legal and ethical method to reduce OSHA recordable out-of-work days. If a driver could not drive, but was a qualified trainer, that driver might be returned-to-work as a trainer, which meant one less "out-of-work" day. Flynn did not find any method to reduce ORI.

29. Practitioners often routinely returned the previously injured worker to work on a Monday, even if the worker might have fully recovered on the prior Friday. Flynn was in close communication with each injured employee. If, for instance the employee stated he was fully recovered, Flynn would suggest that the employee call the Practitioner and ask to be allowed to return to work on Saturday. Since no senior employee worked on Saturday anyway, some would do this, and the Practitioner would release the worker to work on Saturday, resulting in two days less "out-of-work" days. Further this moved the type of injury into a different, less costly category creating an additional $35,000 savings to Boston Sysco each time this was done.

30. Flynn had saved Boston Sysco $70,000 by this method for June and July, 2017. Flynn's innovation was online to save Boston Sysco potentially $360,000 for fiscal year 2018.

31. Flynn's had shared the methodology for this potential savings with the instructor at the Houston, Texas training he received during the week of June 20, 2017. He outlined his methodology and asked straight-forward: Was this method which allowed Boston Sysco massive savings allowed? The response was simply: "Absolutely." Other nurse trainees indicated that they

too would adopt this method of reducing out-of-work days to create savings for their OPCO and to improve metrics.

32. Nurse Flynn had previously found a way to significantly reduce "out-of-work" days by creating a "return-to-work" system for injured workers whose duties were restricted. Nurse Flynn had modified a "transitional / light-duty return-to-work" (RTW) program which resulted in a reduction of 47% injured employee out-of-work days for fiscal year 2016.

33. In 2017, Flynn was repeatedly "called on the carpet," for sending an injured employee to a Practitioner by Wayne Belcher which would result in a visit to Gannon, V.P. of H.R. On one occasion, Belcher reprimanded Flynn for sending a worker to a Practitioner late in the evening, on the same day of the injury. Gannon complained, "We have had nurses that did this before, you should wait before immediately sending him out." Belcher commented, "He's the biggest baby we have." At the end of the discussion Gannon stated to Flynn: "Don't you agree that you acted too quickly in sending him out?" Flynn responded, "I'm sorry, but no, my assessment indicated that it was likely that he had a fractured bone in his foot." Belcher responded with a sigh and exaggerated eye rolling. Flynn left. Upon return to his clinic, Flynn found a phone message from the injured worker which said, "I thought you wanted to know, the x-ray showed that I had a fractured cuboid bone, just as you had suspected."

34. Because of Belcher's "hounding," Flynn developed anxiety symptoms causing him to increase the use of a prescribed pharmaceutical. Concerned, Flynn made multiple attempts to book an appointment with a psychotherapist. Each attempt failed when the clinician refused to accept payment from the mental health insurance provider which Boston Sysco's medical insurance utilized.

35. Flynn had a long-standing medical history of Panic-Anxiety Syndrome which had been well controlled previously.

36. In May or June, an angry middle manager had come to Flynn's office and had stated, "My kid can't go to college this Fall." Confused, Flynn responded, "why?" The manager responded, "because you create OSHA injuries."

37. In May or June, 2017 Julie Gannon, Vice President of Human Resources asked Nurse Flynn to attend a week-long new OHNM training session in Houston, Texas at Sysco headquarters. Nurse Flynn had attended this training session during March of 2016 and had contracted what he believed was a food-borne illness on the first day in Texas. As a result, Mr. Flynn was moderately ill for three of the five days of training. Nurse Flynn agreed that attending the training again seemed to be a great idea and he attended the training.

38. In June, 2017 Julie Gannon instructed Nurse Flynn to visit Sysco Albany LLC, in New York state, purportedly to be instructed by Susan Zarzycki the OHNM there on how to reduce OSHA recordable injuries. Susan Zarzycki had later commented to Nurse Flynn, "I don't know why they sent you here, you know as much as I do."

39. Sysco's fiscal year ends on the Saturday nearest to June 30th. This resulted in a 52-week fiscal year ending July 1, 2017.

40. The Houston training and the Sysco Albany visit effectively removed Flynn from overseeing any injured employees for eight out of the last thirteen days of June, the last, and most important (metrically speaking) month of the fiscal year. Wayne Belcher oversaw injuries in Flynn's absence.

41. Flynn had been assigned oversight of an annual Sysco Boston Red Cross Blood Drive, to be held on August 15, 2017. Belcher had complained to Gannon that Flynn was not doing things right.

42. On or about August 10th Flynn had arranged to have a representative of the Red Cross to come into Boston Sysco and man a table in the cafeteria so that employees could ask questions.

43. The representative agreed and was scheduled to come in at noon on the arranged day. However, Flynn was required to attend a Sysco Corporation nurse phone conference at that time. Therefore, Flynn had asked Belcher's administrative assistant to meet the fellow and help set him up. She agreed.

44. Belcher came across his administrative assistant waiting to meet the Red Cross representative and asked what she was doing. She told him. Belcher told her to leave, and she did. The fellow from the Red Cross arrived but nobody was there to meet him. Belcher informed Gannon of the situation inferring that Flynn was incompetent. However, this unfolded in front of Francine, the receptionist, who heard what Belcher had said to his assistant.

45. Gannon, furious, called Flynn onto the carpet and admonished him. Flynn explained what had happened and suggested that Gannon talk to Francine. The matter was dropped.

46. The Red Cross Drive was a success with pints of blood donated exceeding that of the prior year.

47. Flynn believes that the decision to terminate his employment had been made, and that he was to be terminated on the morning of August 16rd, 2017, the day after the Red Cross Drive, immediately upon arrival. Flynn believes that evidence will prove that Francine the receptionist was ordered to report to Gannon immediately when Flynn arrived.

48. Francine could see employees arriving from the employee parking lot, coming into the building. However, on the 16th, Flynn had business to do such that he would be in and out of his clinic repeatedly that day. Additionally, he arrived (as was allowed) later than usual. Since he would shortly leave again, he parked, not in the employee's lot, but in the more convenient visitor's lot—an area that was not visible to Francine.

49. Flynn believes that Gannon could not find him to fire him, and put the task off until the next day.

9

50. Flynn, who intended to work late into the evening took the opportunity to follow-up on case management of employees who were out-of-work due to injuries.

51. One injured employee's story confused him. One class A driver (delivery associate) named [redacted-M] had not recovered within the normal time-frame for that workers' injury. Gannon had inquired about him earlier and Flynn stated that the injury normally, on average, would have healed already. Flynn had voiced a question that, "maybe [redacted-M] was playing a game."

52. When Flynn called [redacted-M] Flynn asked him how he was doing. The fellow responded, "better, but I still can't drive." Flynn continued but [redacted-M] stated, "I need to go, I'm applying for a job at 7-Eleven (or some convenience store). Flynn stated: "Why would you do that, you're a valued Class A driver?" The fellow stated: "I no work Sysco no more." Flynn, responded, "what do you mean, you don't work at Sysco—did you quit." [redacted-M] stated, "no, they tell me, when I call, I no work there no more." Flynn intended to follow-up with Gannon to find the story. Flynn told [redacted-M] that he would follow up another time. As Sysco Boston nurse, Flynn believed he owed an obligation to [redacted-M] under Massachusetts Board of Nursing rules since [redacted-M] was under his care as an injured worker covered under Massachusetts Workers' Compensation.

53. Flynn arrived at Sysco Boston on August 17th, 2017, and parked in the regular employee's parking lot. Shortly after passing through the gate, where he would be visible to Francine, the receptionist in the general entrance, he was urgently met by an employee telling him that a person in the cafeteria appeared to be having a heart attack. Almost instantly his phone rang, which he answered, "on the run." It was Gannon who told him to come to her office immediately. Gannon did not know about the medical emergency and told Flynn to come to her office as soon as possible after the emergency was resolved.

54. When the medical emergency was resolved, Flynn went to Gannon's office, as he had intended to do anyway because he was concerned about the unreported worker injury from the prior day.

55. Flynn entering Gannon's office casually asked Gannon about [redacted-M] and Gannon dismissively replied, "oh he called up and quit, he doesn't work here anymore."

56. Gannon told Flynn to sit down and proceeded to tell him that he was being terminated. Flynn asked, "may I ask why?" Gannon responded, "you just don't fit in here." Flynn responded, "That's not true, I'm being fired so that Belcher can 'cook the books.'" Gannon responded: "That's preposterous." Flynn replied: "Preposterous—how about 4:30 AM, yesterday [redacted-X] injured his leg and called PC 365. The nurse told him to go to Urgent Care immediately, and he didn't, even though he said he could not walk and could not feel his foot." "He said he was offered 'the plan,' which was a few days off, and would be given a helper," Belcher hid that injury, and that's why he wants me gone."

57. Gannon's entire demeanor changed, she appeared to be unaware of [redacted-X's] injury. Then she calmly stated, "You don't want to work here if you don't fit in, and you can collect Unemployment." Gannon then offered Flynn an envelope with a written severance document which clearly had a "never complain—never take action," gag clause. The document offered severance pay. Flynn refused to sign.

58. Flynn asked Gannon about a future reference and Gannon promised him a "neutral" reference.

59. Flynn was then escorted by Gannon to his clinic office to retrieve personal items. He was asked to give Gannon his iPhone but he declined stating, "That is also my personal phone and has personal things on it, may I wipe it and return it later next week?" Gannon agreed.

60. For every day that [redacted-M] was out of work, that day increased the out-of-work day tally listed on the OSHA 300 Log. If [redacted-M] quit, those days would stop accruing.

61. OSHA guidance for 1904.7(b)(3)(viii). *"May I stop counting days if an employee who is away from work because of an injury or illness retires or leaves my company? Yes, if the employee leaves your company for some reason unrelated to the injury or illness, such as retirement, a plant closing, or to take another job, you may stop counting days away from work or days of restriction/job transfer."*

62. Flynn accuses Boston Sysco of illegally terminating [redacted-M] for three reasons. 1) The employee failed to heal within the expected "average" number of days, and 2) The Employee's English was so poor that nobody ever expected him to understand that Sysco Boston's termination was in violation of Federal EEOC law, OSHA regulation, and Massachusetts Law, Title XXI, Chapter 151B. Flynn believes that this was done specifically to prevent further daily accrual of out-of-work days simply to improve Boston Sysco's metrics.

63. Flynn believes that to this day [redacted-M] does not know that he was terminated by Sysco Boston in violation of law. Flynn has attempted to find [redacted-M] but has failed in his attempts.

64. Sysco Boston utilized PC 365, a Point of Injury Triage and Care Recommendation service created by Gallagher Basset, a Workers' Compensation Claims Services Provider. This phone service allowed an injured worker who could not, for some reason, reach Flynn, the company Registered Nurse for triage and recommendations. This triage service was utilized during night-time hours, or other hours when Flynn was not available.

65. Flynn does not know how communications worked between PC 365 and Belcher and Gannon.

66. PC 365 keeps a recording of the conversation between the nurse and the injured worker in a medical file. That file cannot be changed by anyone since it is a medical record.

12

67. Flynn had been unhappy with PC 365 because the service was not quick in delivering documentation to him. Therefore, he had contacted PC 365 months earlier than his dismissal and asked PC 365 to notify him and send documentation as soon as possible. PC 365 agreed. Belcher and Gannon were unaware that PC 365 was emailing Flynn directly.

68. After doing some Case Management and talking to [redacted-M] Flynn received, or noticed an email communication to him from PC 365. The communication informed Flynn that an injured worker had called the service early in the morning (~4 AM) before Flynn had arrived.

69. Boston Sysco's policy and procedure mandated that any worker injury, no matter how slight resulted, as soon as possible, in Supervisor intervention, and then notification to Safety (Belcher), who then notified an entire pre-determined group by email about details.

70. Flynn had received no email that day about any worker injury.

71. The notification Flynn received from PC 365 had indicated that the injury was serious. Flynn was confused and called the injured employee on the phone. [redacted-X] stated that he had injured himself and that he had been unable to walk, and at the time, could not feel one of his feet. At the time of the phone call [redacted-X] stated that he still could not walk. Flynn asked him, had he seen a Practitioner (doctor) or had he gone to an urgent care facility as advised by PC 365? [redacted-X] stated, "no." A discussion ensued and Flynn told him it was his right, under Massachusetts law that he could go and see a doctor and Flynn suggested that he should. [redacted-X] stated that he did not want to see a Practitioner, ("doctor") that he "was going to stick to the plan." [redacted-X] explained to Flynn that the plan was for him to take "a few days off," and then he "was going to be given a helper."

72. Giving a worker a "helper," was not common current practice according to Sysco's policy and procedure, certainly not because a delivery associate was injured.

13

73. If the worker needed "a few days off," and needed a helper, this constitutes restricted-work-days (RWD) a metric of the OSHA 300 Log.

74. Flynn had been worried that he would soon be fired though July and August and had shared this with other employees and with other Sysco nurses. All told him that "Sysco does not fire people."

75. Some days prior to Flynn's termination, Flynn had mentioned his fears to one employee who stated, "no, you won't be fired." Flynn responded with the comment, "I'm a dead man walking."

76. The week following Flynn's termination, on August 24th, Flynn was returning to Boston Sysco to return the company phone. On his way from New Hampshire to Plympton Massachusetts the phone rang. Flynn was able to answer the phone hands-free. A worker identified himself. He stated: "I'm [redacted-G], you probably remember me." Flynn stated, "Yes, I remember you, why'd you call." The worker said, "I hurt my knee badly..." Flynn immediately interjected and said: "Stop, I have to tell you I've been fired from Boston Sysco and can't advise you." The worker continued anyway, stating "you don't work at Sysco anymore? That's strange, they (Dave Ramos?) told me to call you. [redacted-G] continued: "I hurt my knee. I know it's serious, because it's just like an injury that I had on the other knee that required surgery; they are trying to get me not to report it." Flynn stated, "it's your right to go see a doc, but you must decide what you need to do. This ended the conversation.

77. Trying to interfere or make it difficult for an employee, to not report an injury is a violation of 1904.35(b)(1)(i) "You must establish a reasonable procedure for employees to report work-related injuries and illnesses promptly and accurately. A procedure is not reasonable if it would deter or discourage a reasonable employee from accurately reporting a workplace injury or illness."

78. Boston Sysco's OSHA 300 Log sent to Flynn in July, 2020 shows that [redacted-M's] injury occurred on August 14, 2017. The injury is listed as "Fall or Slip -On the Same Level." The "Days Away from Work" Column (K) lists that the injured employee was away from work for 34 days. This indicates that "the plan," which [redacted-M] told Flynn about did not work, and that the employee had been, in fact, seriously injured and needed to see a medical Practitioner as soon as possible, as recommended by the triage nurse at PC 365. It is unknown if the delay exacerbated the employee's injury or delayed recovery. Delayed treatment of injuries can be detrimental to the employee's health or recovery.

79. Non-reporting of injuries by OPCOs to Sysco Corporation headquarters had been an ongoing issue historically, so much so that an un-reported injury, unreported to the parent Corporation, if discovered, carried severe economic repercussions for the offending OPCO. Sysco Corporation demanded that all OPCO's truthfully reported injuries beyond-first-aid.

80. 29 C.F.R. 1904.35 was amended on May 12, 2016 adding two provisions: Section 1904.35(b)(1)(i) makes explicit the longstanding requirement for employers to have a reasonable procedure for employees to report work-related injuries and illnesses, and (b)(1)(iv) incorporates explicitly into Part 1904 the existing prohibition on retaliating against employees for reporting work-related injuries or illnesses under section 11(c) of the OSH Act, 29 U.S.C. § 660(c). "An employer's reporting procedure is reasonable if it is not unduly burdensome and would not deter a reasonable employee from reporting." Flynn alleges that Sysco Boston was in violation of the law regarding multiple cases noted herein.

81. Flynn believes that while Sysco Corporation's procedure was reasonable. Flynn alleges that Boston Sysco did not always follow the reasonable procedure rule and acted to deter at least three employees from reporting, simply to improve metrics, regardless of risk, and this constitutes a violation of Code of Federal Regulations and endangers injured employees.

82. OSHA 29 C.F.R 1904.7(b)(4) (i)A states re "restricted work": *"You keep the employee from performing one or more of the routine functions of his or her job, or from working the full workday that he or she would otherwise have been scheduled to work."* Note: "You" is the employer, thus, even if the employer did not send the injured worker to a Practitioner, if [redacted-X]'s statement that "he would be given a few days off," this alone constitutes restricted work that should have been listed on the OSHA log, which was not. OSHA defines "routine function" as a work activity regularly performed at least once per week. In this case, a delivery associate who drove a Class A rig every day, and who is now unable to drive, or move hundreds of pounds of materials creates a recordable case, because he is now unable to do that every day. It does not matter, per OSHA regulations, if the worker chose not to see a Practitioner.

83. If "routine function," is "work activity regularly performed at least once per week," Flynn now believes that some, or possibly all prior injuries on Flynn's watch that resulted in assigning the injured employee as "trainer," were violations of Code.

84. Flynn subsequently made a formal complaint to OSHA on or around January 1, 2018.

85. Flynn has asked OSHA for copies of all communications relating to his complaint including phone transcripts. He has received none.

86. Flynn has, on two occasions formally requested, under the Right to Know Laws, through OSHA's website. He has been assigned case numbers but to this date, has received nothing.

87. Flynn, in addition to having a medical history of Panic-Anxiety Syndrome has a long-standing history of Depression which had been well controlled.

88. In the months before and after Sysco's termination Flynn became depressed and suffered from greatly increased anxiety/panic attacks.

89. Flynn sought out psychotherapy and has undergone numerous psychotherapy sessions since the termination.

90. Flynn made repeated attempts at finding employment as an Occupational Health Registered Nurse after his termination and was interviewed, in what he though was several successful interviews, yet he was not hired.

91. Gannon had promised Flynn a "neutral reference." Flynn had applied on multiple occasions for employment and thought he would be hired, but was not. He wondered if Boston Sysco was "reference ghosting" him by not honoring reference requests and/or giving him a negative reference. On October 25, 2018 Mr. Flynn hired Jeffrey Shane of Allison Taylor Company, a   professional employment reference checking and verification service to check his reference with Sysco Boston. After ten calls and two faxes no reference was given by Sysco Boston, even though Allison Taylor complied with Boston Sysco's request for a release.

92. Allison Taylor, at Flynn's request, also queried Sysco Corporation's Director of Occupational Health, Paul LeBlanc, APRN, who did respond and rated Mr. Flynn 4 ( 4 = "good" ) in Crisis Management, 4+ in Interpersonal Relations and Employee Relations, and 5 (5 = "Outstanding" in Oral Communications; Written Communications; Technical Skills; Productivity; Decision Making, Personal Integrity, and "Overall Performance."

93. Flynn, without a prime reference became more depressed. One symptom that he had been struggling with was a self-perceived negative change in his memory which caused increased anxiety and depression. Flynn attempted to find out if he was cognitively suffering memory loss and applied for help from the New Hampshire Department of Education, Disability Services.

94. Flynn struggled with varying levels of panic/anxiety, depression and sleep disruption through 2017 and 2018.

95. At the time of his termination Flynn was engaged to Nene A. Canoy, (Canoy) a resident of Balamban, Cebu, Republic of Philippines.

96. Flynn became engaged to Canoy on March 5, 2017. Acceptance of the engagement included a promise to each other to have one or more children.

97. Flynn has obstructive azoospermia and cannot father a child by normal coitus. Canoy knew this but was assured by Flynn that fertility medicine could, relatively easily, utilizing percutaneous epididymal sperm aspiration and intracytoplasmic sperm injection create a pregnancy, with a high degree of likelihood within six months.

98. Canoy, when married to Flynn intended to become a Massachusetts resident and the couple intended to purchase a house near Plympton, MA., making Canoy eligible for Massachusetts insurance coverage.

99. Massachusetts sets the gold standard for fertility medicine insurance coverage in the United States, and the couple intended to proceed with their plans to create a family immediately after marriage.

100. After being terminated, Flynn looked for a job in or close to Massachusetts, with intention of living in Massachusetts, but he was unsuccessful.

101. Flynn owned a triplex apartment house in New Hampshire, and occupied one of his apartments where he could live very inexpensively.

102. Flynn and Canoy were married on July 5, 2018.

103. The couple have been unable to proceed with their plans of creating a family, even though Flynn intended and looked for work in Massachusetts. The necessary medical procedures were within their economic means if resident in Massachusetts, but not in New Hampshire.

104. During the summer of 2018, Flynn saw a Sysco Truck that was stopped and recognized the driver as one he knew. Flynn stopped to say hi to the driver. The driver asked Flynn, "what happened to you?" Flynn responded: "I was terminated so that injuries could be hidden to

18

improve metrics." The driver responded, "that makes sense, I had an injury and they tried to get me to not report it."

## CLAIMS

### Count 1

### Wrongful Termination in Violation of Public Policy

105. Plaintiff incorporates the foregoing paragraphs from his Complaint by reference.

106. Defendant was Plaintiff's employer.

107. Plaintiff's termination was in violation of the fundamental public policies of the Commonwealth of Massachusetts.

108. Defendant terminated Plaintiff, not in retaliation for what he had done, nor, specifically in retaliation for that which he did not do, but preemptively to make sure that transgressions of law that had been done, and those whose actors intended to do, (and who did) in the future, when necessary, to prevent hits to the metrics of the OSHA Log, would not be caught by Sysco Corporation (the parent Corporation) or by OSHA. The best method to achieve the freedom to do this was to remove the "watchdog," which was effectively done by Plaintiffs' termination.

109. Defendant's actions were willful, malicious, dangerous, fraudulent and oppressive, and were committed with wrongful intent to injure the Plaintiff and in conscious disregard of Plaintiff's rights and the rights of injured workers that Plaintiff cared for, merely to improve corporate metrics and to increase management bonuses.

110. As a result of Defendant's actions, Plaintiff suffered sustained economic damages to be proven at trial, in addition to punitive damages, if allowed. As a further result of Defendant's actions, Plaintiff suffered emotional distress, and/or physical harm, resulting in damages to be proven at trial. As a further result of Defendant's actions Plaintiff and his wife suffered lack of

19

consortium due to the economic destruction caused by Plaintiff's termination, and refusal of Boston Sysco to give potential employers a reference which left Plaintiff financially unable to proceed with fertility services.

### Count II

**Intentional infliction of emotional distress.**

111. Plaintiff incorporates the foregoing paragraphs from his Complaint by reference.

112. Defendant was Plaintiff's employer.

113. Belcher's action in dismissing his assistant, thus leaving the Red Cross Representative alone, and then implying to Gannon V.P of H.R. that Flynn was incompetent, was a set-up which was specifically designed to cause the Plaintiff's termination, causing him to suffer humiliation, mental anguish, emotional and physical distress.

114. At the time of Plaintiff's termination, Gannon appeared to not know that [redacted-X's] injury had been hidden. Plaintiff informed Gannon of the name, the time, the injury and the illegal "plan," which was sufficient to create a duty to Plaintiff. Yet Gannon continued and negligently and callously terminated Plaintiff anyway without any attempt to verify the alleged hidden [redacted-X] injury. Gannon's actions were specifically designed to cause the Plaintiff to suffer humiliation, mental anguish, emotional and physical distress. Even if not specifically designed, an average person would expect that humiliation, mental anguish, emotional and physical distress would ensue to a person being discharged wrongly, in light of Gannon's being informed of illegal activities at Sysco Boston.

115. Defendant failed in its agreement to give Plaintiff a "neutral" reference as can be seen by Taylor Company's twelve unfruitful attempts, consisting of ten phone calls and two faxes including sending Defendant a proper release. Defendant's actions were specifically designed to cause the Plaintiff to suffer humiliation, mental anguish, emotional and physical distress and

20

economic harm to his career. Even if not specifically designed, an average person would expect that humiliation, mental anguish, emotional and physical distress and damage to his future career would ensue to a person denied a prime employment reference.

116. As a result of Defendant's actions, Plaintiff suffered sustained economic damages to be proven at trial, in addition to punitive damages, if allowed. As a further result of Defendant's actions, Plaintiff suffered emotional distress, and/or physical harm, resulting in damages to be proven at trial. As a further result of Defendant's actions Plaintiff and his wife suffered lack of consortium by inability to create their intended family due to the economic destruction and career destruction caused by Plaintiff's termination, and refusal of Sysco Boston to give potential employers a reference.

### Count III

### Breach of Implied Contract Not to Terminate Without Good Cause

117. Defendant's claim that Plaintiff was terminated because "he did not fit in," is not supported by fact. Plaintiff was not terminated for any good cause.

118. At Plaintiff's in-person interview Plaintiff asked the question: "How often are employees fired?" The answer was that employees were very rarely fired, and if so, only for serious charges.

119. Plaintiff was privy to a list of all Sysco Boston past employees. (Plaintiff is not sure how far back the list went, but it covered many prior years.) Out of hundreds of employees that no longer worked for Sysco Boston, he remembers seeing few that were fired, almost all were listed as "voluntary quits."

120. Plaintiff had discussed his fear of being terminated with other Sysco nurses and other Boston Sysco employees. The common thread of response was: "Sysco never fires anyone, so you aren't going to be fired." The only exception to this was one employee who mentioned that there

was a period where some employees were let go due to an economic slow-down, this being many years prior.

121. Gannon had already seen that Belcher had set-up Plaintiff for failure since Gannon must have followed-up with Francine, the receptionist during the Red Cross representative incident. Therefore, when presented with the information about [redacted-x's] alleged hidden injury, Gannon had an obligation to let Plaintiff appeal the decision to terminate. Alternatively, Gannon had an obligation to conduct an investigation, which she failed to do.

**122.** Defendant had an obligation to inform Plaintiff that he "did not fit in," and allow him the opportunity to change his ways in a manner that Defendant found suitable. However, Plaintiff would not legally be required to "fit in," if it meant violating OSHA regulations.

### Prayers for Relief

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

1. Enter Judgement in Plaintiff's favor on Counts I and II and III of this Complaint.

2. Award all damages allowed, including punitive damages, and/or multiple damages if allowed, in a sum to be determined at trial, but sufficient to meet the jurisdictional requirements of this Honorable Court, plus interest, costs and fees.

3. Award such other relief as this Honorable Court deems just and fair.

### Plaintiff demands a trial by jury on all issues raised in this Complaint.

Respectfully submitted

Plaintiff, J. Stephen Flynn, Pro se

_Pro se_

42 Pine Street,

22

Keene, NH 03431

503-545-8681

StephenFlynnRN@gmail.com

DATED: August ⎰⎱2⎱, 2020

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) | DOCKET NUMBER 2083CV00597 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Flynn, J. Stephen vs. Sysco Boston, LLC | Robert S. Creedon, Jr., Clerk of Courts |
|---|---|

| TO: J. Stephen Flynn 42 Pine Street Keene, NH 03431 | COURT NAME & ADDRESS Plymouth County Superior Court - Brockton 72 Belmont Street Brockton, MA 02301 |
|---|---|

### TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

| STAGES OF LITIGATION | DEADLINE | | |
|---|---|---|---|
| | SERVED BY | FILED BY | HEARD BY |
| Service of process made and return filed with the Court | | 11/12/2020 | |
| Response to the complaint filed (also see MRCP 12) | | 12/11/2020 | |
| All motions under MRCP 12, 19, and 20 | 12/11/2020 | 01/11/2021 | 02/09/2021 |
| All motions under MRCP 15 | 12/11/2020 | 01/11/2021 | 02/09/2021 |
| All discovery requests **and depositions** served and non-expert depositions completed | 06/09/2021 | | |
| All motions under MRCP 56 | 07/09/2021 | 08/09/2021 | |
| Final pre-trial conference held and/or firm trial date set | | | 12/06/2021 |
| Case shall be resolved and judgment shall issue by | | | 08/15/2022 |

**The final pre-trial deadline is not the scheduled date of the conference.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to

| DATE ISSUED 08/13/2020 | ASSISTANT CLERK | PHONE |
|---|---|---|

Date/Time Printed: 08-13-2020 12:43:36

SCV026\ 08/2018